1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7                        DISTRICT OF NEVADA
8                              * * *
9   GREG TAKUNG CHAO,                    Case No. 2:14-cv-02039-GMN-PAL
10                        Petitioner,                    ORDER
       v.
11  D.W. NEVEN, et al.,
12
                         Respondents.
13

        Greg Takung Chao's petition for a writ of habeas corpus pursuant to 28 U.S.C. §
2254 is before the court for final adjudication on the merits (ECF No. 21).  As discussed
below, the petition is denied.

I.      **Procedural History and Background**

        In June 2005, Chao was tried for robbery with use of a deadly weapon and murder
with use of a deadly weapon (*see* exhibits 11, 55).[1]  The jury deadlocked, and the court
declared a mistrial.  Exh. 55, p. 7.  Chao's second trial commenced in May 2007, and
the jury found him guilty of count 1: robbery with use of a deadly weapon and count 2:
first-degree murder with use of a deadly weapon.  Exh. 131.  After a penalty hearing,
the jury returned a verdict of life in prison without the possibility of parole on the murder
count.  Exh. 136. In September 2007, the state district court sentenced Chao to 72 to
180 months on count 1, with an equal and consecutive term for the deadly weapon, and
to life in prison without the possibility for parole on count 2, with an equal and

---

[1] Exhibits referenced in this order are exhibits to respondents' motion to dismiss, ECF No. 25, and are found
at ECF Nos. 26-32.

consecutive term for the deadly weapon.  Exh. 139.  Judgment of conviction was entered on September 12, 2007.  Exh. 140.

The Nevada Supreme Court affirmed Chao's convictions in June 2010.  Exh. 194. The state supreme court affirmed the denial of Chao's state postconviction petition in March 2017.  Exh. 273.

In the meantime, petitioner dispatched his federal petition for filing on December 1, 2014 (ECF No. 11).  This court granted Chao's motion to stay his federal petition pending the completion of his state-court proceedings (ECF No. 7).  In November 2017, this court granted petitioner's motion to reopen the case and granted his motion for counsel (ECF No. 12).  Chao filed a first-amended petition (ECF No. 21).  Respondents have now answered the remaining grounds, and Chao replied (ECF Nos. 44, 53).

II.    **Legal Standard—Antiterrorism and Effective Death Penalty Act**

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts

2

with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the

state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires

substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by
> substantial evidence in the state-court record, it is not enough that we
> would reverse in similar circumstances if this were an appeal from a
> district court decision. Rather, we must be convinced that an appellate
> panel, applying the normal standards of appellate review, could not
> reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393

F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be

correct unless rebutted by clear and convincing evidence. The petitioner bears the

burden of proving by a preponderance of the evidence that he is entitled to habeas

relief. *Cullen*, 563 U.S. at 181.  Finally, in conducting an AEDPA analysis, this court

looks to the last reasoned state-court decision.  *Murray v. Schriro*, 745 F.3d 984, 996

(9th Cir. 2014).

A state prisoner is entitled to federal habeas relief only if he is being held in custody

in violation of the constitution, laws or treaties of the United States.  28 U.S.C. §

2254(a).  Unless an issue of federal constitutional or statutory law is implicated by the

facts presented, the claim is not cognizable under federal habeas corpus.  *Estelle v.*

*McGuire*, 502 U.S. 62, 68 (1991).  A petitioner may not transform a state-law issue into

a federal one merely by asserting a violation of due process.  *Langford v. Day*, 110 F.3d

1380, 1381 (9th Cir. 1996).  Alleged errors in the interpretation or application of state

law do not warrant habeas relief.  *Hubbart v. Knapp*, 379 F.3d 773, 779-80 (9th Cir.

2004).

**III.    Trial Testimony**

On the morning of December 9, 1997, Las Vegas Imperial Palace hotel employees

discovered Don Idiens' body in the 17th floor stairwell.  Exh. 121, pp. 44, 55, 74-76. He

was wearing only bloody underwear and socks and a bag was tied over his head. *Id*. at 208, 215.

Michael Prascak testified that he met the victim, Don Idiens, about two or three months before he was killed. Exh. 121, pp. 155-189.  Prascak said he and Idiens, who had traveled from his native Canada to gamble in Las Vegas, would play poker nearly every day at the Mirage during that time. Prascak testified that Idiens typically carried about $3,500-$5,000 on him when they played poker.

Prascak stated that on the night Idiens was killed, Idiens left his poker table at the Mirage's poker room and told Prascak he was going across the street to the Imperial Palace to collect money from another Canadian man Idiens had loaned money to, "an Asian guy that he had played before in a casino." *Id*. at 166-67. Idiens suggested that when he returned, he and Prascak should go get something to eat. That was the last time Prascak saw Idiens; he learned the next day when he arrived to play poker that Idiens was dead.

Chao is an Asian man from Canada who had just met Idiens a few days prior while gambling. Exh. 122, pp. 197-99; exh. 123, p. 143. He stayed in room 18136 at the Imperial Palace from December 1 to December 9, 1997. Room 18136 is located close to the stairwell in which security discovered Idiens' body.

In December of 1997, the Imperial Palace essentially had cameras everywhere except inside the guest rooms, the guest hallways, and stairwells. Exh. 127, p. 180. Video from those cameras showed Chao entering the Imperial Palace and taking the elevator up to the guest rooms at approximately 3:45 p.m. on December 8. *Id*. at 146. Around 5:25 pm surveillance showed Idiens also taking the elevator at the Imperial Place up to the guest rooms. *Id*. Idiens could not be located on any surveillance tape anywhere in the Imperial Palace after that elevator ride. *Id*. at 137-38.

Approximately an hour after Mr. Idiens was last seen, at 6:24 p.m., surveillance showed Chao taking the guest elevator and exiting the Imperial Palace in different

clothes than he was wearing when he went up at 3:45 p.m. *Id.* at pp. 148-49. An hour later, Chao returned to the Imperial Palace and went up to the guest rooms again briefly. *Id*. at pp. 149-50. Three minutes after going up, Chao came back downstairs and exited again. *Id*. at 150. Chao returned to the Imperial Palace and took the elevator back up to the guest rooms at 1:43 a.m. *Id*. at pp. 150-51. Chao did not appear on any more surveillance in the Imperial Palace until the next morning at 8:13 a.m. *Id*. at 151. At some point in the evening, one of the maids responsible for cleaning the 18th floor, where room 18136 was located, saw Chao entering room 18136. Exh. 123, pp. 165-66. She noted Chao covered his hand with his shirt to open the dooknob. *Id*.

A little after 8 a.m. on December 9, Chao approached the Imperial Palace front desk clerk to check out. *Id*. at 123, pp. 141, 143-147; *see also* exh. 124, pp. 13-30. Chao wanted to change the name on the room reservation to his purported friend Joe Galloway, who Chao said stayed in the room with him. *Id*. at 145-46. Chao claimed the room needed to be in his friend's name instead of his "for a business write-off." *Id*. at 145. After the front desk complied with Chao's request to change the name on room 18136, Chao paid cash to check out, telling the employee he "did not want any trace of a credit card that was on file." *Id*. at 146-47. Chao further wanted the clerk to "remove all credit card information" from not just the hotel bill, but "completely removed out of the system." *Id*. at 146. After paying the bill from a large stack of cash "loaded" with 100s and 20s, Chao left, then returned to the front desk and claimed he had discussed the phone bill with Joe Galloway. *Id*. at 148-49. Chao stated that pursuant to this discussion, he and Galloway wanted all traces of the phone bill associated with room 18136 removed as well – specifically, he requested on behalf of himself and Galloway that the bills be "completely moved off of the billing and out of the system so that there was no trace of them." *Id*. at pp. 149-50. Chao waited for a new bill to be printed, reviewed it, and saw the clerk had missed one of the phone calls, and asked her to delete that as well. *Id*. Chao also requested his hotel restaurant bill charged to his room

be returned to him and stated he would just pay cash. *Id.* at pp. 151-52. The paperwork for the charge contained his name, room number, and signature. Exh. 124, p. 25. Chao said he wanted the information removed from the hotel bill and the paperwork related to the charge destroyed because it was not business related. Exh. 123, pp. 151-53. Chao also requested the clerk throw away his registration card. *Id.* at 155. He told her specifically he wanted everything related to his name erased out of the system. *Id*. at p. 156.

Shortly thereafter Chao returned to the 18th floor, approached one of the maids responsible for cleaning the 18th floor rooms, and asked her to let him into room 18136. *Id*. at pp. 162-63. The maid advised Chao she could not let him in, at which time Chao became angry. *Id*. at pp. 164-65. The maid offered to call security to let him in, but instead he walked away. *Id*. at p. 164. When the maids eventually entered room 18136 to clean it, the carpeting appeared to have already been cleaned and shampooed. *Id*. at p. 81.

Alane Olson testified that she was a medical examiner at the Clark County Coroner's office. *Id*. at 76-172. Olson reviewed the autopsy report and crime scene photographs from Idiens' death. Olson stated that the report indicated that Idiens' suffered extensive and multiple blunt-force trauma to his head and neck that caused skull fractures and a fracture under the right eye socket. Extensive bruises were on the brain, and fragments of his skull were lodged within the brain.  Idiens' arm had minor scrapes that possibly could be consistent with defensive injuries.

Peter LaPrairie testified that as a prosecutor with the Federal Prosecution Service of Canada he was involved in Chao's 1999 extradition hearing. *Id*. at 189-236. LaPrairie stated that Chao testified at that hearing as follows: he drove to Seattle from the area of Vancouver, British Columbia and flew to Las Vegas on December 1, 1997. He flew back to Seattle on December 9, 1997.  Chao said he then flew to Bellingham where a friend picked him up. Chao stayed at the Imperial Palace in room 18136. When he checked

out the morning of December 9, he paid cash, changed his name on the hotel bill to Joe Galloway, and bought a duffel bag at the gift shop. Chao acknowledged that he did not have a duffel bag when he returned to Canada. He denied that it was his signature on Imperial Palace hotel food bills, though he agreed that it was his name on the bills. Chao said that he met Idiens in Las Vegas at the Mirage. Chao said that two Las Vegas Metropolitan Police Department (LVMPD) detectives came to Canada and told him they were there to investigate Idiens' death and that Chao was the suspect. Chao told the detectives that he did not know anything.

Thomas Wahl testified that he was a DNA analyst with LVMPD at the time in question. Exh. 122, pp. 237-256, exh. 123, pp. 4-122. He stated that when tested in 1997, the DNA profile derived from blood samples on the carpet in room 18136 generally matched the DNA profile of Idiens, though there was an inconsistency.  Wahl explained that they preserved the samples; in 1999 the technology had advanced, and they re-tested the samples. He testified that the new test results showed that it was Idiens' blood on the carpet in room 18136.

Norah Rudin, a private forensic DNA consultant, testified as a defense expert. Exh. 127, pp. 196-266.  She testified that she reviewed reports, laboratory notes, testimony, and electronic data from LVMPD. She used LVMPD's raw data and re-analyzed it with her computer software. Rudin testified that she found some evidence of a minor DNA profile, in addition to Idiens' profile, on one of the tested carpet tack strips. She explained that she analyzed the DNA at a "lower level," which she translated as a closer or more-detailed analysis than LVMPD conducted.  Comparing Chao's profile and the minor profile, she concluded that Chao could not be a contributor. On cross-examination Rudin agreed that she was not asked to reexamine the actual pieces of evidence themselves or re-swab them and test them. She also stated that the profile for Idiens and the minor profile came off the swab together, but there was no way to know when either DNA profile was deposited.

LVMPD Homicide Detective Thomas Thowsen responded to the homicide scene. Exh. 124, pp. 30-169; exh. 125, pp. 50-132; exh. 125, pp. 164-165. The State introduced Mirage surveillance video, and Thowsen explained that it showed Idiens arriving in the parking garage around 11 a.m. on December 8 and then leaving through the front doors at 5:19 p.m. He opined that Idiens was not killed in the Imperial Palace stairwell where he was found because he had severe head trauma from multiple strikes which would have resulted in a lot of bleeding as well as blood spatter, and there was not a large amount of blood where the body was discovered. Thowsen testified that on December 12 Imperial Palace staff contacted him about a room that looked suspicious. He inspected room 18136 and found some tile grout that appeared to be stained a darker color, and droplets of what looked like blood splatter on the wall. He discovered tile itself that appeared to be stained with blood, and when he peeled back the edge of the carpet it appeared to be stained with blood underneath.

Thowsen also testified that Idiens' friend Phil Barber told him that Idiens had loaned $1,000 to Chao. Exh. 125, p. 128.

## IV.    Petition

### Ground 1

Chao asserts that the trial court violated his Fourteenth Amendment due process rights because it failed to instruct the jury that an afterthought robbery cannot serve as a valid predicate offense to first-degree felony murder (ECF No. 21, pp. 12-15).

To obtain relief based on an error in instructing the jury, a habeas petitioner must show the "'instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Where the defect is the failure to give an instruction, the inquiry is the same, but the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law.  *See Henderson v. Kibbe*, 431 U.S. 145, 155-157 (1977); *see also Estelle*, 502

9

U.S. at 72. The federal constitution requires the State to prove every element of the charged offense. *See Sandstrom v. Montana*, 442 U.S. 510, 521 (1979) (holding that a defendant is deprived of due process if a jury instruction has, or jury instructions have, "the effect of relieving the State of the burden of proof enunciated. . . on the critical question of the petitioner's state of mind"); *accord Francis v. Franklin*, 471 U.S. 307, 326 (1985) (reaffirming "the rule of *Sandstrom* and the wellspring due process principles from which it was drawn"); *see also In re Winship*, 9 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged").

The Nevada Supreme Court has held that if a person kills someone and then forms the intent to rob him/her, the robbery cannot support a finding of felony murder. *See Nay v. Nevada*, 167 P.3d 430, 435 (Nev. 2007). The court has further held a defendant is entitled to have the jury instructed that an afterthought robbery cannot serve as a predicate felony for felony murder. *See Cortinas v. Nevada*, 195 P.3d 315, 319 (Nev. 2008).

The Ninth Circuit, however, has observed that 17 stab wounds did not prove deliberation, as they could equally have been a result of "passion," supporting a verdict of "second-degree murder committed while in the throes of a heated argument." *Chambers v. McDaniel*, 546 F.3d 1191, 1200-1201 (9th Cir. 2008). There, the jury had been improperly instructed on the element of premeditation. The Court found the evidence against Chambers "was not so great that it precluded a verdict of second-degree murder" and therefore concluded "the error had a substantial and injurious effect or influence on the jury's verdict." *Id*.

"A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one." *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (citing *Stromberg v. California*, 283 U.S. 359

(1931); *Yates v. United States*, 354 U.S. 298 (1957)). Upon finding of such an error, the question becomes "whether the flaw in the instructions 'had a substantial and injurious effect or influence in determining the jury's verdict." *Id*. (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

Jury Instruction No. 11 read:

There is a kind of murder which carries with it conclusive evidence of premeditation and malice aforethought. This class of murder is murder committed in the perpetration or attempted perpetration of robbery. Therefore, a killing which is committed in the perpetration of such a robbery is deemed to be Murder of the First Degree, whether the killing was intentional or unintentional or accidental. This is called the Felony-Murder rule.

The intent to perpetrate or attempt to perpetrate robbery must be proven beyond a reasonable doubt.

Exh. 129.

The jury was also instructed that they did not have to reach a unanimous decision regarding the principle of criminal liability. "It is sufficient that each of you find beyond a reasonable doubt that the murder, under any one of the principles of criminal liability, was Murder of the First Degree. *Id*., jury instruction no. 14.

The defense requested several additional instructions to inform the jury that intent to commit the robbery must have been formed before or at the time of the killing to find felony murder; an afterthought robbery does not trigger the felony-murder rule. Exh. 132, jury instruction nos. 0-1, 0-2, 0-3. The state district court declined to give the requested instructions.

The prosecutor argued during closing:

So do we have evidence of an intent to kill in this case? Well, look what happened to Don Idiens. Greg Chao took a blunt object and hit him in the head enough to push and crack his skull and push it into his brain. That is an act of ill will. That is an act designed to kill.

Exh. 128, pp. 29-30.

> What about the second element that must be present for a first-degree murder to occur? And that element is known as deliberation, and deliberation is defined as a deliberate determination may be arrived at in a short period of time . . .

> So basically what that instruction tells you is that there has to be some thought process behind the killing itself. Now, you may consider the first hits to Don Idiens' head. That can arguably be a rash, unconsidered impulse. But you know from Dr. Olson's testimony that he wasn't hit once. He wasn't hit twice. He wasn't three times. He was hit again and again and again. There was a process behind the killing. It was a deliberate action.

> *Id*. at 30.

> Now in this case, you know that Don Idiens was struck from the head again and again and again, and anywhere along the line Greg Chao could have stopped, but he made the decision to keep hitting him again and again and again. And that is a premeditated killing.

> *Id*. at 31.

The prosecutor discussed felony murder:

> And basically what that instruction tells you is if you commit a robbery and someone dies during the robbery, whether it was intentional, unintentional, or accidental, you are on the hook for a first-degree murder whether you meant to kill him, whether it was accidental or unintentional. If the killing occurs during the perpetration of that robbery, it is a first-degree murder.

> *Id*. at 32.

The State emphasized that the jury did not have to reach a unanimous decision as to whether it was first-degree murder or felony murder to convict Chao of first-degree murder. The State also argued against a voluntary manslaughter verdict based on the felony-murder rule:

> But even if there was a physical or verbal altercation between the two, voluntary manslaughter is still an inappropriate verdict, and that's because of the felony murder rule and the robbery which you know occurred. Once that robbery occurs, it's automatically first-degree murder with use of a deadly weapon.

> *Id*. at 34.

The Nevada Supreme Court agreed that it was error not to instruct the jury about the timing of forming the intent to rob:

> Chao contends that the district court committed reversible error by failing to instruct the jury that robbery cannot serve as a valid predicate offense to first-degree felony murder unless the evidence shows that the intent to rob was formed prior to the time of the killing pursuant to this court's holdings in *Nay v. State*, 123 Nev. 326, 333, 167 P.8d 430, 435 (2007), and *Cortinas v. State*, 124 Nev. 195 P.3d 315, 326 (2008), cert. denied, 130 S. Ct. 416 (2009). While we agree that it was an error not to instruct the jury that afterthought robbery cannot serve as valid predicate offense to first-degree felony murder in light of our recent decisions in *Nay* and *Cortinas*, we conclude that the error was harmless.
>
> We must review whether the instructional error in this case is harmless beyond a reasonable doubt. *See Cortinas*, 195 P.3d at 324. In reviewing this type of error for harmlessness, "we are not confined to considering whether the jury actually determined guilt under a valid theory, but may look beyond what the jury actually found to what a rational jury would have found if properly instructed." *Id*. at 325. Thus, we must look to whether there is sufficient evidence to indicate that a rational jury, if properly instructed, would have found Chao guilty of willful, premeditated, and deliberate murder. *See id*. at 325-26 ([T]he evidence presented to the jury . . . [is] relevant to our harmless-error review."); NRS 200.030(1)(a) (Willful, deliberate, and premeditated killing is murder in the first degree.).
>
> Upon reviewing the evidence adduced at trial as to the nature and extent of Idiens' injuries, we can be confident that the jury would have found that Chao killed Idiens in a willful, deliberate, and premeditated manner if it had been properly instructed. *See Valdez v. State*, 124 Nev. 196 P.3d 465, 485-86 (2008) ("Generally, the State proves premeditation through circumstantial evidence, including the nature and extent of the injuries."); *Hern v. State*, 97 Nev. 529, 533,636 P.2d 278, 28I (1981) (stating that "[t]he nature and extent of the injuries, coupled with repeated blows, constitutes substantial evidence of willfulness, premeditation and deliberation.").
>
> As we mentioned in the previous section, the evidence adduced at trial indicated that Chao struck Idiens in the head 12 to 14 times with such force that portions of Idiens' skull were found lodged in his brain, his eye socket was fractured, his ear was nearly severed from his head, and, upon being discovered, Idiens' body was devoid of any blood. By repeatedly striking Idiens with a blunt force object that resulted in the brutal and extensive nature of Idiens' injuries, we conclude that a jury would have found Chao guilty of first-degree murder by means of a willful, deliberate, and premeditated killing if it had been properly instructed. *See Byford v. State*, 116 Nev. 215, 236-37,994 P.2d 700, 714 (2000) ("Willfulness is the

13

intent to kill. There need be no appreciable space of time between the formation of the intent to kill and the act of killing. Deliberation is the process of determining upon a course of action to kill as a result of thought . . . . Premeditation is a design, a determination to kill, distinctly formed in the mind by the time of the killing.").

Thus, we conclude that the failure to instruct the jury that afterthought robbery cannot serve as a valid predicate offense to first-degree felony murder was harmless.

Exh. 194, pp. 8-10.

Idiens was killed by extensive, brutally severe blunt force blows delivered by an unknown object. The court notes that *Chambers* is distinguishable in that, unlike here, there was substantial evidence to support the defendant's insistence that he acted in self defense. Moreover, that federal appeals court decision does not constitute clearly established federal law. The nature and extent of Idiens' injuries supported a jury verdict of first-degree murder under Nevada law. The Nevada Supreme Court's conclusion that the jury instruction error was harmless because the jury would have found that Chao killed Idiens in a willful, deliberate, and premeditated manner if it had been properly instructed is entitled to deference. Chao has failed to demonstrate that the Nevada Supreme Court's decision on federal ground 1 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Ground 1, therefore, is denied.

**Ground 3**

Chao argues that the trial court violated his Fifth Amendment right to not incriminate himself when it admitted the statements made by Chao during his Canadian extradition proceedings (ECF No. 21, pp. 23-25).

Under United States federal law, a defendant's testimony at a hearing on a motion to suppress is not admissible as proof of guilt against him in a subsequent criminal trial unless he makes no objection. *Simmons v. United States*, 390 U.S. 377, 390-94 (1968).

This testimony must be given in support of Fourth Amendment rights. *Id*. at 394 (noting in contrast that plaintiff's testimony in a civil suit is still admissible against him in subsequent criminal prosecution. *Id*. at n.23). The United States Supreme Court has consistently declined to expand the *Simmons* rule to other situations beyond admissibility of motion to suppress testimony to prove guilt at trial. *See, e.g., United States v. Salvucci*, 448 U.S. 83, 93-94, 94 n.7, n.9 (1980); *see also Rakas v. Illinois*, 439 U.S. 128, 134 (1978); *Jeffers v. United States*, 432 U.S. 137, 154 n.21 (1977); *United States v. Kahan*, 415 U.S. 239, 243 (1974); *Brown v. United States*, 411 U.S. 223, 228-30 (1973). As the Court explained, it is the "need to choose between waiving the Fifth Amendment privilege and asserting an incriminating interest in evidence sought to be suppressed, or invoking the privilege but thereby forsaking the claim for exclusion," that creates the tension between surrendering one constitutional right to assert another and therefore warrants *Simmons* protection. *Kahan*, 415 U.S. at 242 (citing *Simmons*, 390 U.S. at 394). *Simmons* protection therefore does not extend to situations where a defendant is merely faced with giving up one advantage for another. *Stuard v. Stewart*, 401 F.3d 1064, 1069 (9th Cir. 2005); *see also United States v. Flores*, 679 F.2d 173, 177-78 (9th Cir. 1982)

In 1999, the United States sought to have Chao extradited from Canada. Canadian authorities attempted to use statements made by Chao to the LVMPD detectives during the extradition hearing. Chao, represented by counsel, moved to exclude them, challenging the voluntariness of the statements. Exh. 122, pp. 201-202. The Canadian court conducted a "voir dire." *Id*. at 202, 223. The court first warned Chao and his counsel that if he chose to testify that his statements may be used against him in other contexts, including possibly in any subsequent criminal trial in the United States. *See, e.g*., exhs. 74, 75. Chao testified to establish the involuntariness of his statements. Exh. 122, p. 202. The Canadian court ultimately ruled the statements inadmissible, finding

the prosecutor failed to establish beyond a reasonable doubt that the statements were voluntary. *Id*. at 226-228.

Chao's counsel moved to preclude the State from using Chao's testimony regarding the Canadian suppression hearing during his Nevada criminal trial. Exh. 73. The trial court denied the motion, reasoning that *Simmons* only applies to a choice between giving up one U.S. Constitutional right for another. Exh. 75. The court stated that this was a Canadian extradition hearing, which appears to be civil in nature and that, moreover, an extradition proceeding in the U.S. *is* considered civil in nature. Finally, the court pointed out that Chao had counsel during the extradition proceedings and that the Canadian court warned him appropriately of the potential consequences of testifying. *Id*. As set forth above, Peter LaPrairie, a prosecutor with the Federal Prosecution Service of Canada testified as to what Chao told the Canadian court during the extradition hearing.

The Nevada Supreme Court rejected this claim:

> We review Chao's contention that the district court should not have admitted his extradition hearing testimony de novo. *See Hernandez v. State*, 124 Nev. 188 P.3d 1126, 1131 (2008) ("[W]e review various issues regarding the admissibility of evidence that implicate constitutional rights as mixed questions of law and fact subject to de novo review.").

> Under NRS 47.090, testimony given by the accused at a preliminary hearing regarding the admissibility of statements by the accused or evidence allegedly unlawfully obtained "is not admissible against [him] on the issue of guilt at the trial." This statute evolved from the seminal case of *Simmons v. United States*, 390 U.S. 377 (1968), where the United States Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt . . . ." 390 U.S. at 394 (finding it intolerable that one constitutional right—i.e., the right to remain silent—should have to be surrendered in order to assert another—i.e., the right to suppress unlawfully obtained evidence); *Stuard v. Stewart*, 401 F.3d 1064, 1069 (9th Cir. 2005) (referring to this scenario rather appropriately as a "Catch-22").

> During the "voir dire" phase of Canadian extradition proceedings, Chao sought to exclude statements that he made to Las Vegas Metropolitan Police Department (LVMPD) detectives as being obtained involuntarily.

1
2

> After cautioning Chao that his testimony [at the extradition proceeding] might be used in subsequent legal proceedings, the Canadian court ultimately excluded the [earlier] statements [Chao made to LVMPD].

3
4
5
6
7
8
9
10
11
12
13
14
15
16

> Despite the obvious similarities between the "voir dire" phase of the extradition hearing and an NRS 47.090 hearing, there is an important distinction between the two types of proceedings. Unlike NRS 47.090 hearings, which are necessarily criminal proceedings that occur after an accused has been charged with a crime, extradition proceedings are a hybrid—part administrative, part civil, and part criminal in nature. *See Snider v. Seung Lee*, 584 F.3d 193, 203 n.2 (4th Cir. 2009) ('Extradition is sui generis, neither civil nor criminal in nature."); *Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 828 (11th Cir. 1993) ("An extradition proceeding [is an executive function and] . . . [i]t clearly is not a criminal proceeding."); *Matter of Extradition of Pazienza*, 619 F.Supp 611, 618 (S..D.N.Y. 1985) (An extradition proceeding is neither strictly criminal nor civil; it is a hybrid,"). Therefore, because the constitutional rights guaranteed by *Simmons* and codified by NRS 47.090 only apply to criminal proceedings, and extradition hearings are distinct hybrid proceedings, *see. e.g., Martin*, 993 F.2d at 829 ("Constitutional procedural protections which by their terms are applicable only in criminal cases, however, are unavailable in extradition proceedings."); *Taylor v. Jackson*, 470 F. Supp 1290, 1292 (S.D.N.Y. 1979) (concluding that the Sixth Amendment's guarantee of a speedy trial and the right to assistance of counsel do not apply to extradition proceedings), we cannot conclude that an extradition hearing and a NRS 47.090 hearing are one and the same. Accordingly, the district court did not err in admitting Chao's testimony from his extradition hearing.

17  Exh. 194, pp. 4-6.

18  This court agrees with respondents that no United States Constitutional rights were

19  at issue when Chao was before the Canadian extradition court and that the Canadian

20  extradition proceeding was neither functionally nor figuratively a suppression hearing

21  connected to Chao's subsequent criminal prosecution in the United States. In any

22  event, Chao has not shown that the Nevada Supreme Court's decision on federal

23  ground 3 was contrary to, or involved an unreasonable application of, clearly

24  established federal law, as determined by the U.S. Supreme Court, or was based on an

25  unreasonable determination of the facts in light of the evidence presented in the state

26  court proceeding.  28 U.S.C. § 2254(d).  Ground 3, therefore, is denied.

27
28

**Ground 4**

Chao contends that the State committed prosecutorial misconduct when it engaged in burden shifting in violation of his Fourteenth Amendment due process rights (ECF No. 21, pp. 25-27).  He argues that the question of DNA was a major evidentiary issue, and the prosecutor improperly shifted the burden to the defense when he argued in closing that the defense expert could have conducted her own testing instead of reviewing raw data.

It is long-established that prosecutors are legally and ethically bound to refrain from improper argument. *Berger v. United States*, 295 U.S. 78, 88 (1934) "It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id*. at 88.

Prosecutorial misconduct may "'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). To constitute a due process violation, the prosecutorial misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Greer*, 483 U.S. at 765, quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985). It is not enough for the prosecutorial remarks to be improper, undesirable, or even universally condemned. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal citations omitted). Moreover, arguments of counsel carry less weight than instructions from the court. *Boyde v. California*, 494 U.S. 370, 384 (1990) (observing that arguments are the work of advocates, while the court's instructions are "definitive and binding statements of the law").

In closing arguments, the prosecutor challenged the testimony of defense expert Rudin:

> If you really want to know is that or is not DNA, test the thing, Ms. Rudin. That's all you had to do. The extract has been sitting there for ten years.

Exh. 128, p. 137.

Chao's counsel objected that the prosecutor was shifting the burden of proof; the court, apparently overruling the objection, simply stated: "No burden shifting." *Id*.

The prosecutor responded:

> Oh, and I'll submit to you they don't have any burden to do so. But if Ms. Rudin wants to get up here and give you an opinion that that may be DNA when she had the ability to determine whether or not that's DNA, that's something you could assess her credibility. . . .
>
> Well, look at her data. Basically she says there are four or five points that are probably DNA, but one of them she says, you know, it looks like it's pull-up or maybe it's a combination of pull-up and DNA. Well, run the test, lady, if you want to tell us that.

Exh. 128, p. 137, 139.

The Nevada Supreme Court stated that it thoroughly reviewed this claim and concluded that it lacked merit and warranted no further discussion. Exh. 194, p. 2, n.1.

This claim lacks merit. The prosecutor acknowledged that the DNA expert had no duty to independently test the DNA. The jury instructions also directed the jury that the State bore the burden of proving every material element of the crime charged beyond a reasonable doubt. Even assuming, *arguendo*, that the statements rose to the level of prosecutorial misconduct, they certainly did not so infect the trial with unfairness as to violate Chao's due process rights. Chao has failed to demonstrate the Nevada Supreme Court's decision on federal ground 4 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Ground 4, therefore, is denied.

The petition, therefore, is denied in its entirety.

## V.    Certificate of Appealability

This is a final order adverse to the petitioner.  As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA).  Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id*.

Having reviewed its determinations and rulings in adjudicating Chao's petition, the court finds that reasonable jurists might find its determination of ground 1 to be debatable pursuant to S*lack*.  The court therefore issues a certificate of appealability with respect to ground 1.

## VI.    Conclusion

**IT IS THEREFORE ORDERED** that the amended petition (ECF No. 21) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED** as to ground 1.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly and close this case.

DATED: 23 September 2021.

GLORIA M. NAVARRO
UNITED STATES DISTRICT JUDGE

20